IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| JAMES T. MOORE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 07-0193-CV-W-ODS |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION AFFIRMING COMMISSIONER'S FINAL DECISION TERMINATING AND DENYING BENEFITS

### I. BACKGROUND

#### A. Procedural Summary

Plaintiff originally applied for disability benefits in September 1985. The application was denied initially, but an ALJ found Plaintiff was entitled to benefits as of April 13, 1984. Plaintiff's eligibility for benefits was periodically reviewed as required by law; in January 1997 it was determined Plaintiff's medical condition improved to the point he was no longer eligible for benefits, and Plaintiff was advised his benefits would cease at the end of March. The decision was upheld by an ALJ and Plaintiff initiated an appeal in this Court, but the case was remanded in September 2002 at the Commissioner's request. Another hearing was held in September 2003, which affirmed the decision to terminate Plaintiff's benefits.

Meanwhile, in August or September 2000, Plaintiff filed a second application for benefits, alleging an onset date of January 13, 1997. The application was denied at the administrative level and again by an ALJ.

In December 2003, the Appeals Council consolidated the cessation case and the second application, vacated both decisions, and remanded for another hearing. The

hearing was held in April 2004, and a decision affirming both the cessation of the original award and the denial of the second application was issued in May 2004. This decision stands as the Commissioner's final decision.

### B.  Factual Summary[1]

In the April 21, 1987, order granting benefits, the ALJ found Plaintiff was a thirty-four year old high school graduate with prior work experience as a diesel mechanic. Plaintiff's application for benefits asserted he became disabled on April 13, 1984, due to a broken neck suffered in a car accident. The ALJ found Plaintiff suffered fractures at C-4 and C-5 with subluxation at C-5 and C-6 which required installation of a halo traction vest. R. at 321. The halo vest was worn for three months, during which time Plaintiff developed an infection due to the screws holding the vest in place. Following treatment for the infection, Plaintiff continued to experience chronic pain, stiffness, and limited range of motion in his neck. R. at 322.

The accident also injured Plaintiff's back. In addition to chronic pain, Plaintiff suffered from a "significant limitation" in his range of motion and was unable to bend normally. Plaintiff also developed a limp. R. at 322.

Plaintiff's pain was treated with Tylenol #4, which contains codeine. The medicine eventually resulted in (1) damage to Plaintiff's stomach and (2) a dependancy on codeine. He started treatment with Methadone, and by February 1986 his addiction to codeine was in remission. However, he was still taking Methadone and Tagamet. Plaintiff also developed "anxiety and depression which occurred when he broke up with his fiancee." R. at 322.

The ALJ found Plaintiff suffered from codeine and Methadone addiction, affective disorder accompanied by depression, and a variety of secondary effects that left him

---

[1]The Record is quite voluminous; at over 2,200 pages it is more than four times the size of the typical administrative record in Social Security cases. The Court has reviewed the entire Record, but it is neither practical nor necessary for every single detail to be reiterated in this Order.

2

with moderate restrictions on the activities of daily living and the ability to maintain social functioning, but Plaintiff did not meet any of the Listed Impairments. R. at 322-23. However, in addition to drug addiction, the ALJ found Plaintiff suffered from, among other things, chronic pain, weekly blackout spells, double vision, limited range of motion in his back, neck and extremities, and could sit only for ninety minutes at a time and stand for fifteen minutes at a time. The combination of impairments persuaded the ALJ Plaintiff was unable to engage in substantial gainful activity. R. at 323.

In the ensuing years, Plaintiff underwent drug treatment on numerous occasions. He underwent inpatient treatment from December 14, 1988 to January 17, 1989. R. at 470-71. He was hospitalized for a week in May 1993 for treatment of methadone and cocaine addiction. A report from his physician for the last four years indicated Plaintiff "was always being exceedingly needy and displaying drug seeking behavior." R. at 483-87. A medical report indicates a hospital stay in August 1993 for treatment of addiction. R. at 477. In June 1994 Plaintiff went to the VA Hospital with a myriad of complaints and was quite insistent on receiving Vicodin. This request was denied, and Plaintiff became verbally abusive and combative. A physical exam revealed his neck to be "supple" and he was fully ambulatory. R. at 474-76.

Plaintiff was admitted for drug treatment for six weeks in April 1995. At the time of admission he tested positive for cocaine, and while he was there he insisted upon receiving Vicodin. At some point he was given an eight-hour pass from the facility, but he never returned and was discharged *in abstentia*. R. at 515-21. In December 1995 he was admitted to the hospital for drug treatment, but left on a pass and went on a cocaine-binge.

In early January 1996, Plaintiff was admitted to the VA Hospital in Leavenworth and provisionally accepted into the Domiciliary Program. He was homeless at the time but "working as a courier in Kansas City." He "denied any recent substance abuse, but tested positive" for cocaine. R. at 553-55. The reporting physician summarized Plaintiff's situation as follows:

> The essence of the story is as follows: This patient is a substance abuser and denies it. He desires the Domiciliary and has been told that

3

> [substance abuse treatment] is [a] prerequisite for getting in. However, he did deny any substance abuse problem to the Substance Abuse team. There was no evidence for acute psychiatric disturbance. He describes his mood as "good"; he reports his medications as "working well". He basically wants a place to stay . . . .

R. at 555-56. He left "to travel to Kansas City VA to apply to their Substance Abuse Unit" but did not return and was discharged. R. at 556.

Plaintiff went back to the hospital in late May of 1996, complaining of pain and depression; he was also treated for substance abuse. He again sought admission to the Domiciliary Program, but "subsequently found a place to stay in the community and also, apparently landed an employment opportunity as a courier. He was looking forward optimistically to starting to work and having a place to go stay." R. at 551. Plaintiff left on a pass on or around June 8 and did not return. R. at 550-52.

Plaintiff's drug abuse continued after the date established by the Commissioner as the date Plaintiff's benefits should stop. In May 1997 Plaintiff was hospitalized with complaints of depression and suicidal thoughts. He was employed at a temporary job, and his history of drug seeking behavior and malingering was noted. R. at 770-73. In June 1997 he was admitted again for suicidal thoughts. The doctor chronicled Plaintiff's history of seeking and somehow disposing of large quantities of Vicodin and his many explanations that his medication was lost or "thrown away," necessitating a need for replacement. Plaintiff was diagnosed as suffering from drug dependance. R. at 768-69. Plaintiff also claimed to have injured his neck in a car accident the preceding week, R. at 769, but a physical examination was normal. When told his pain could be treated with "non-narcotic analgesics, the patient became verbally abusive and threatened suicide." R. at 760-61. Plaintiff's pattern of seeking drugs, along with physician's suspicions and doubts about Plaintiff's need for drugs, continued for some time. E.g., R. at 758, 740-42, 738, 733.

On October 16, 1997, Plaintiff asked his doctor to "write a letter supporting his disability for chronic pain and major depression." The doctor declined, noting Plaintiff "has been treated for both chronic pain and major depression with good response, and continues in treatment." R. at 732. The doctor discussed the issue again on January

4

14, 1998, noting he had told Plaintiff and his attorney that he did not support the claim. On that day, Plaintiff denied symptoms of depression. R. at 607.

In September 1999, an MRI revealed a herniated disk, R. at 1179, and the next month Plaintiff underwent a diskectomy and fusion. On discharge he was to return in two weeks. R. at 1160. He returned early complaining of pain, but his "malingering history" was noted. He was prescribed Vicodin and instructed to return as scheduled. R. at 1186-87. On November 3, Plaintiff's medication was continued. R. at 1184-85. On November 8, an MRI revealed narrowing of the disk space at C-6 and C-7 and muscle spasms in the cervical spine, but no fractures or subluxation. R. at 1183. On November 15, Plaintiff reported some reduction in neck pain. R. at 1182.

In April 2000, Plaintiff sought admission to a chronic pain rehabilitation program. However, he expressed a strong reluctance to eliminating his use of narcotic drugs. R. at 1223-25. He was eventually terminated from the program. R. at 1234. On June 8, 2000, Plaintiff went to North Kansas City Hospital complaining of seizures and back pain. Medical tests revealed he had not had a seizure. The doctor expressed his belief that Plaintiff "used all of his medicine and he needs more medicine and that is why he came to the hospital. . . . The patient is very manipulative and wants to be on drugs." R. at 1511. A drug test "was positive for amphetamine and opioids and barbiturates." R. at 1512.

In July 2001, Plaintiff admitted to counselors that he was abusing his prescription medication. R. at 1999. Counseling notes from the Fall of 2001 indicate Plaintiff tested positive for cocaine. He also reported that he was working. R. at 1991, 1993, 1995, 1997-98. Indications of his employment also appear in records from January 2002. R. at 1989. In February and March 2002, Plaintiff was arrested multiple times for driving without a license, for warrants issued for failure to pay past fines, and for failure to complete an alcoholism program. R. at 1983-88. On May 3, 2002, Plaintiff stated "his job was going well." R. at 1976. On May 13, Plaintiff expressed a fear that he might be incarcerated for failure to pay a ticket, which would cause him to lose "his job at the Lake City [Ammunition] plant where he works 3-4 twelve hour days per week." R. at 1973.

5

An exam conducted in August 2003 revealed diminished sensation in Plaintiff's left arm and left leg, but intact sensation on his right side. R. at 2199. An MRI conducted in November 2003 revealed mild spurring but no disk protrusions or herniations. R. at 2131. In February 2004, Plaintiff reported that his pain had been "controlled until recently. He states pain is dull and constant with some intermittent sharp pains in neck and back." R. at 2167. An EEG conducted in March 2004 failed to indicate a seizure disorder, but Plaintiff refused to accept any other diagnosis. R. at 2162.

During the April 2004 hearing, Plaintiff testified his hands get numb on a regular basis, and have done so since the 1984 auto accident. R. at 2273. He has held jobs for short periods of time; he was laid off from one but claims his neck and back treatment kept him from adhering to a work schedule. R. at 2274-77. He experiences seizures that sometimes last an entire day. R. at 2277-78. The seizures sometimes occur every two to three hours, and some days he does not have any at all. R. at 2291. Plaintiff alleges he cannot work because of the constant pain in his neck and back. The pain is not always severe, but it is always present. R. at 2282-83. He indicated he can stand for ten minutes to fifteen minutes before needing to sit down, sit for thirty minutes before needing to stand up, and walk for one hundred yards before needing to rest. R. at 2283-84. He usually spends his day watching television. R. at 2297. He also spends a lot of his time laying down, because it is difficult to sit or stand for very long. R. at 2299-2300.

A medical expert, Dr. Malcolm Brahms, testified. Dr. Brahms is an orthopedic surgeon, and based on his review of Plaintiff's medical records he opined that Plaintiff's 1999 surgery was successful in that there was no stenosis although there were changes in the cervical spine. R. at 2303. Dr. Brahms noted Plaintiff had been hospitalized on numerous occasions for reasons unrelated to his back or neck. R. at 2303-04. He concluded Plaintiff was limited to light work with the added restrictions of no overhead work and a need to avoid extreme temperature and fumes. More specifically, Dr. Brahms indicated Plaintiff could sit for eight hours a day and could stand "for long periods of time" if he had the option to sit or stand as he desired. R. at 2304-05.

A vocational expert ("VE") was asked a hypothetical question assuming a person of Plaintiff's age, education and work experience and who suffers from seizures that last for several minutes, cannot operate a motor vehicle or dangerous machinery, has difficulty with fine motor skills, and with an unlimited ability to sit or stand so long as he had the option to do either. The hypothetical also asked the VE to assume Plaintiff could perform light work except for anything involving overhead work and needed to avoid temperature extremes. The VE testified such an individual could work as a bench assembler, cashier, or a duplicating machine operator. R. at 2309-13. In the second hypothetical, the VE was asked to also assume the person needed to lie down two or three times a day for thirty to sixty minutes at a time, and the VE testified such a person could not perform work. R. at 2313-14. In the third hypothetical, the VE was asked to assume the same facts presented in the first hypothetical and add an inability to concentrate up to one third of the day due to the combined effects of pain and depression; the VE testified such an individual could not perform work. R. at 2314. In response to questioning from Plaintiff's attorney, the VE testified a person could not work if they missed work two days a week due to pain, depression, concerns about health, or any other reason. R. at 2314. Finally, in response to a question asking her to assume all the facts in the first hypothetical and add marked limitations in social functioning that led to "frequent run-ins with coworkers, supervisors and employees," the VE testified such a person could not perform work. R. at 2315.

The ALJ concluded "the record is consistent with a moderate to marked level of dysfunction in terms of restrictions of activities of daily living, marked difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace and four or more repeated episodes of decompensation, each of extended duration." R. at 1256. However, most of these limitations are attributed to Plaintiff's abuse of drugs (both legal and illegal), and if the effects of such abuse are removed "the record is consistent with no more than a mild restriction of activities of daily living, mild social dysfunction, mild concentration deficits and no episodes of decompensation of extended duration." R. at 1256. The ALJ also credited Dr. Brahms' summary of the medical evidence and rejected Plaintiff's subjective complaints based

7

on the medical evidence in the Record and Plaintiff's contradictory. R. at 1256-57. "Although claimant denies it, his most severe problem since the cessation [of benefits] has been his chronic mixed substance abuse problem and when that is not considered he can obviously perform a range of light work with a sit/stand option." R. at 1257. The ALJ ultimately found Plaintiff was disabled, but was not entitled to benefits because he retained the functional capacity to work if the effects of his drug addiction(s) were removed from consideration.

## II. DISCUSSION

This case presents two general issues for discussion: (1) was there substantial evidence supporting the Commissioner's decision to terminate Plaintiff's benefits in January 1997, and, if so,[2] (2) was there substantial evidence supporting the Commissioner's decision to deny application for benefits?

An award of benefits may be terminated if there is substantial evidence (1) that the claimant's impairment has improved to the point the claimant can perform substantial gainful activity, (2) advances in medical or vocational therapy or technology render the person able to perform substantial gainful activity. 42 U.S.C. § 423(f). "Substantial evidence is evidence which reasonable minds would accept as adequate to support the Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a

---

[2]If Plaintiff's benefits should not have been terminated in January 1997, there is no need to consider the application for benefits filed in 2000.

8

reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

A.

The Record contains abundant evidence supporting the ALJ's determination that Plaintiff's condition improved by January 1997 and that he retained the functional capacity to work after that date. The ALJ relied upon treating doctor's reports, both for what they said and what they did not say. No treating doctor believed Plaintiff's functional abilities were limited by his neck or back problems, and there are scant complaints about those problems in the Record at that time. Plaintiff's testimony depicted greater limitations than he related to his doctors, which further justified discounting his subjective complaints. Plaintiff also held jobs and lost them for reasons unrelated to his back and neck, such as the need to undergo drug treatment, the effects of his drug abuse, or his incarceration for failing to pay tickets. The ALJ's determination was supported by substantial evidence.

In arguing to the contrary, Plaintiff contends the ALJ applied more weight to Dr. Brahms' opinion than to the opinions of examining physicians. First, Dr. Brahms merely summarized the evidence in the Record, and the ALJ agreed with that summary. The summary is supported by substantial evidence, so the ALJ's reliance was proper. Second, Plaintiff's discussion is limited to consultants that saw Plaintiff on one occasion each. Dr. Asaghar Chaudhary saw Plaintiff in December 1996 and diagnosed him as suffering from chronic pain in his neck, left shoulder, left hip, and left leg. Plaintiff also reported being able to sit for three hours at a time, stand for fifteen minutes, walk one quarter of a mile, and lift and carry thirty pounds. R. at 571-73. However, these opinions are inconsistent with (1) reports issued by Plaintiff's treating physicians, (2) Plaintiff's complaints to his treating physicians, and (3) Plaintiff's own testimony. A consulting psychologist (Michael Schwartz, Ph.D.) saw Plaintiff in October 1997 and said his impression was that Plaintiff's "depression is fairly well controlled and that there's a large characterological component to his difficulties. He has interacted with

9

the health care system extensively over many years and one's index of suspicion in regard to his manipulation of the system is quite high." R. at 583. The "characterologoical component," combined with Plaintiff's "history of poor judgment and drug dependence," caused Mr. Schwartz to believe Plaintiff was unable to manage his own finances and his prognosis was poor. R. at 583-84. These statements do not reflect on Plaintiff's physical condition. Furthermore, as will be discussed shortly, Plaintiff's drug use was a factor in the ultimate conclusion.

Finally, the Court observes Plaintiff does not suggest the ALJ's findings are inconsistent with the opinions of treating physicians. This is particularly significant in this case, given the volume of medical records available. The Court's review also failed to reveal any difference between the ALJ's findings and the opinions of the doctors who were most familiar with Plaintiff's condition.

<u>B.</u>

If the Commissioner determines that drug or alcohol addiction is a contributing factor to the determination that a person is disabled, he must then determine whether the claimant would be disabled if he stopped using the drugs or alcohol. Plaintiff argues the ALJ's conclusion about the effects of his drug use are not supported by the Record. While Plaintiff has a history of depression, the Record supports the conclusion that it is controlled. The facts recounted earlier in this Order easily constitute substantial evidence supporting the ALJ's determination that most (if not all) of Plaintiff's limitations stem from his abuse of legal and illegal drugs.

<u>C.</u>

Finally, Plaintiff contends there was insufficient evidence to support the ALJ's ultimate conclusion that Plaintiff's physical condition allowed him to work. Plaintiff relies heavily upon his own testimony, but as noted earlier the ALJ was justified in discounting Plaintiff's credibility. Plaintiff's many attempts to work (which failed for reasons

10

unrelated to his physical problems) and his failure to register complaints of a similar severity with his treating physicians stand as two remarkable bases for the ALJ's rejection of Plaintiff's testimony. In addition, the objective medical evidence is inconsistent with Plaintiff's subjective testimony.

### III. CONCLUSION

For these reasons, the Commissioner's final decision is affirmed.

IT IS SO ORDERED.

                                    /s/ Ortrie D. Smith
                                    ORTRIE D. SMITH, JUDGE
DATE: January 18, 2008          UNITED STATES DISTRICT COURT